Case number 23-1334, Industrial Energy Consumers of America et al. Petitioners versus Federal Energy Regulatory Commission. Mr. Stark for the petitioners, Mr. Perkins for the respondents, Mr. Street for the intervener. Mr. Stark, good morning. Good morning, your honors. Thank you for the opportunity to present here today. May it please the court, Ken Stark for the commission, for the petitioners. This case concerns the application of the Just and Reasonable Rates Standard in the Federal Power Act to the Federal Energy Regulatory Commission's issuance of a financial incentive to a utility to engage in transmission project development when the rights to that project have not been demonstrated. There's a threshold issue that's presented on project eligibility. How can the FERC award an incentive to a specific entity for a specific project without knowing for sure whether in fact that entity has the rights to the project? Can I ask what the status of the, oh I'm sorry, what the status of the state court? The status of the state court litigation, and your honor, I will highlight some key points here. When the application was filed with the FERC in May of 2023, there was an Iowa Supreme Court decision that had enjoined enforcement of the law to which project rights were claimed. The current status today is it's ongoing. However, the incumbent utilities in the state of Iowa are no longer challenging the constitutionality of the statute in question, which rendered the preferential right for the in-state incumbents to claim rights to an interstate regional transmission project. So what's left of the case? The case is still being argued with respect to the scope of the injunction. Because the MISO, the grid operator, has a tariff provision that requires it to apply state rights of first refusal laws, there's a question about the obligation of the incumbent utility that was assigned the project by MISO, the grid operator. And so what is still being challenged is the scope and the applicability of the injunction. But the injunction that the Supreme has been permanent at this point in time, the only way to prevent irreparable harm to the competitive developers, the competition of the utility here today, is to cease through the issuance of that injunction. So that the applicability of the injunction, actions taken under the injunction, are still being litigated today. But the constitutionality of the statute in question is no longer being challenged, and that Roe v. Statute is off the books. But wasn't the injunction based on the constitutionality of the statute? Yes, your honor. And why is the injunction still being litigated? The scope of it and the applicability of it. I'm sorry, why wouldn't they vacate the injunction if there's no longer a challenge to the merits? Well, it's about whether there's arguments with respect to the retroactive applicability of the injunction. So the litigants commenced, the competitive developers in Iowa commenced the litigation in October of 2020. July of 2022, the grid operator MISO effectuates an automated assignment by just noting this in an Excel file and posting on its website that the project in question, LRTP 13, the Skunk River IPA project, what's at issue today, as well as four other Iowa-based projects, is assigned to the local TO, the local transmission owner. I understand that, but that doesn't go to the legal issue, which is the injunction was presumably granted because there was a finding of... Yes, so the injunction by the district court. So there was a temporary injunction. The Supreme Court was specific with respect to enforcement of the law. Questions arose, well, does it apply to specific projects? The grid operator effectuated assignment in July of 2022. And then in December of 2023, the district court issues a permanent enjoyment, and it is very specific as to the projects, including LRTP 13. But was the permanent injunction based on this constitutional issue that now is no longer challenged? Yes, it's all flowing. So it's not just that they're not appealing the constitutional issue, it's not that they think it's... I'm just trying to understand why this injunction is still in place and isn't vacant if nobody thinks that this is unconstitutional. Well, my understanding of the Iowa litigation is with respect to just the scope and the applicability of the injunction. So the fight is, my understanding is... No, but clarify for us, the state Supreme Court, was it holding that the right of first refusal statute was unconstitutional under state constitution? The state, the Supreme Court was temporary enjoyment of it, determining that the plaintiffs challenging the constitutionality had a high likelihood of successfully merits. And so it was remanded back to the district court. That's right. So it's remanded, and that aspect of the case is still going on, correct? Part of the case is still going on, not the constitution. What I don't understand, I'm following up on Judge Pan's question. I thought the Iowa Supreme Court had a holding, and basically that holding required the lower courts, both the intermediate appellate court and the trial court, to change their previous holdings. Correct, Your Honor. So that, as a matter of law, has been decided by the Iowa Supreme Court, and it's binding on everyone, correct? That's my understanding. Now the question is, does it apply to this automatic assignment that MISO does? Is that correct? Correct. That is an open question, correct.  So is it the case that the district court found this right of first refusal provision unconstitutional when it granted the permanent injunction, but nobody's appealing that? Is that what you're saying now? All they're appealing now is the scope of the injunction. That's my understanding. Okay. I think now I understand what's happening. Yes. So there's another threshold issue here, which is standing. Can you explain why you believe that the organizations you represent, which represent consumers, have standing in this case? Because you're not the regulated parties, and so that's generally more difficult. Certainly, Your Honor. So the abandoned plant incentive is a practice affecting rates under the Federal Power Act. Nobody disagrees. The orders below are final. The final agency actions, no one disagrees. An issue has been raised, not by FERC, who recognizes that the final orders below effectuate and increase the expansion of the scope of that beneficial assurance of that incentive from 50% potential future cost recovery to 100% potential future cost recovery. That cannot be re-litigated or challenged in any future cost recovery proceeding. So that is the injury in the agreement today. Well, let me ask you about that. I'm not clear. The order 879 arose out of a notice and comment proceeding where the 100% recovery was identified. So your clients and anyone else had an opportunity to comment then. But now the 879 order is controlling so that anyone or any entity that applies for this special treatment has the right to seek 100% reimbursement. That's not an issue that is before FERC, is it? I mean, I understand the eligibility of the intervener to apply for this is a separate question, but anyone who is eligible for this special treatment has the right to ask for 100%. And that's not a litigable issue, if you understand. You can't say, well, they only ought to get 50% or they only ought to get 75%. Certainly, Your Honor, and I would like to address two elements of that. Order 679, which was promulgated around 2006, and there was a rehearing order, order 679-A, and at least one of the petitioners, the Coalition of Transmission Customers, did request rehearing of that order and raised concerns with respect to the applicability of section 219 of the Federal Power Act and how the Commission was looking to apply its just and reasonable rate standard, which is expressly incorporated. Sections 205 and 206, the just and reasonable rate standards, are expressly incorporated in 219. And we did take that issue, at least one of the petitioners here today, as a member of other industrial customers, said, we're very concerned that this just provides excessive costs. No, I understand all that, counsel. What I'm getting at is 679 and 679-A, those are final, are they not? They are, but at the point in time, what we're seeing here is now the Commission has been applying 679-A, and so we did not know at the time how exactly it would be applied. We're not, we're challenging the applicability of the increase to 100% in this instant case because it's, we do not. So is that a collateral attack on 679? We're really challenging the Commission's applicability of 679 to the facts of this case. All right, but that's a separate question from whether or not a properly qualified applicant is entitled to 100% of the recovery. That's already been decided by 679, hasn't it? Correct, that has been decided by 679, and yes, our consumers have taken policy disagreements with that decision. But here, the issue is that the total package of incentives requested have not been demonstrated to be narrowly tailored to the risks and challenges presented. But before you get to that, can you stick with standing? I don't understand why you have standing. It seems to me that your theory is that somewhere down the line, you might have to bear the burden of paying for these abandonment, or these costs, these prudently incurred costs, but that's down the line, and it's highly contingent. And it's also not clear to me why the rates are going to go up because of this, because who's paying for this project if it's not abandoned? Isn't it through rate increases anyway? So I don't really understand that aspect. The issuance of the incentive itself is something that we cannot challenge in any later proceeding. That doesn't mean you have standing, though. That happens sometimes. People comment all the time about rules. That doesn't mean they have standing in an Article III court to then appeal that. Right, so I would look at the San Diego case from this court, where this court determined that the denial of an incentive to a utility was sufficient to warrant standing in that case because the court recognized, and it spoke in terms of the inability of the utility to seek that future benefit in a future proceeding. That is a utility, though. Utility is a regulated party, and so their standing is a bit more And I think in that case, too, there was a reasoning that the inability to get a commitment now that those costs would be covered later was affecting their ability, for example, their capital costs and other things. So that's very different from what's happening here, where you're representing consumers. The consumer's interest is just that their rates might go up, somewhere down the line. And I find it difficult to sort of buy an argument that says, any time agency action affects consumer rates going up, consumers have standing to challenge that agency action. Right. Essentially, if this court were to find no standing, this issue would be capable of repetition and would avoid judicial review because we cannot challenge the incentive. No, I'm talking about standing. Right. Well, if I could play this out with maybe a hypothetical, if there's $100 million that is sought for cost recovery in the future, and the 100% potential rule applies, it's 100% that would need to be litigated and challenged in the future, as opposed to the 50%. But what if it's not abandoned? What if the project's not abandoned? Well, if the project's not abandoned, the commission and in the San Diego case recognized that this is a two-stage process here. This is not an automatic, and there's not speculation upon. I think San Diego is distinguishable because that was actually a regulated party and it's easier for them to achieve standing. And there were immediate costs to the utility of not having that guarantee. In your case, how is this an immediate and concrete injury when it could be that this project won't even be abandoned and you won't have to pay anything? Well, there's an immediate transfer of risk that happened on the day in August 2023 that the first order was issued, because that's the date by which a potential cost recovery can be sought in the future. So for the immediate transfer of risk away from the utility to the consumers, I think is sufficient, even if we can't quantify it. But who's going to pay for this project if the project's not abandoned? Is it through rate increases? Through a formula rate process at FERC. So that's why I just don't understand. If it's not abandoned, there's a rate increase, and you're going to pay for it. If it is abandoned, there'll be a rate increase, you're going to pay for it. How are you injured? We would be precluded from challenging the components of the incentive. We have two different legal standards here, too, that I think is worth highlighting, two different legal tests. At stage one, we have the nexus test, which I meant whether it's tailored to the investments, whether the risk... That goes to the merits. Right. And then in any future cost recovery proceeding, it's the prudent standard that applies. And that's whether a manager that was in the shoes of the utility, the incident utility that is seeking cost recovery, would have done the same thing under the same circumstances and incurred costs in the same way. So let's follow up. Excuse me. I was just going to say, the future cost recovery, the prudence review does not protect, does not provide the protection for consumers to challenge the cost because of the expansion of the incentive. But go ahead, Your Honor. I was looking into competitor standing, and of course, none of your clients, as I understand it, is a utility, so they're not competitors to ITC. But what I'm trying to figure out is, are your clients concerned that once the commission approved ITC's application at step one, that even before step two, ITC may incur costs that then when we get to step two, which may be either abandonment or moving ahead with the project, that those costs will be borne by your clients because the ITC will be able to include those costs in the rate base that your clients have to pay? Yes, Your Honor, that is part of the concern. Well, I was trying to see that worked up in your brief because your argument is, understanding is self-evident. And the cases you cite, it seems to me, don't demonstrate that for some of the reasons that Judge Pan has identified. Yes, I do want to clarify, one of the petitioners, a resale power group of Iowa, represents municipal utilities. So some of them are in municipal utilities. They are subjected to the transmission rates of ITC that they have to pass through to the residential customers. I just want to clarify from a standing point of view. But they're not a competitor in the sense that they would take over the project, right? No, no, they're not a competitor. All right, so then following up. But there are municipal entities, I should say, as far as I know, Your Honor, they're not a competitor, but municipal entities have partnered with other transmission utilities on projects. Well, all I'm trying to say is, when I was looking for an analogy here, I couldn't find it, at least as I understand the matter, because I was trying to follow through on FERC's footnote concession, that it is not arguing that you lack standing as to the competitive element. And I was trying to understand, and I'll ask the FERC attorney, exactly what that means. Right, that was note five on, I think, page 27. I think that's where they're speaking of. That's sort of the argument we were trying to make earlier about FERC recognizing that the proportion of recoverable costs cannot be litigated later. What do you mean by the proportion? The increase from 50% to 100%. But my previous questions were trying to clarify that Order 679 makes it clear that an applicant can apply for 100%. That's not subject to further review, unless FERC decides to amend Order 679. But what you can do at step two is say, some of these costs are not prudent, but to the extent FERC finds they're prudent, then the recovery can be up to 100%. I didn't see footnote five as suggesting that was subject to consideration at step two. Right. And I will clarify, there has been a pending rulemaking on transmission incentives that's been pending with the Commission for a couple of years, where they are reevaluating. Well, what we're dealing is with what's on the books now. Correct. And we would ask this Court to focus on our statutory purpose of Section 219, which is to benefit consumers by ensuring reliability and reducing the cost of delivered power. So following up at step two, suppose ITC comes in with a proposal to recover, I don't know, $500 million for doing X. And the consumers come in and offer evidence as to either why that wasn't a prudent decision, either in whole or part. Isn't that the time to raise all those issues? But we can challenge whether a proportion of the costs are prudently incurred or not, but the scope by which we have to challenge prudence, the costs that could be recovered have been expanded. And the challenges, and we will point, they're very few. Expanded how? The scope of recovery has been expanded. And so when you look at the... That's in Order 679. In other words, if ITC can show that these costs are prudent and FERC can show that these costs are prudent, all that prudent cost, right? Right. Yes. I mean, there is a factor in the Order 679 Nexus test that there needs to be a demonstration that the resulting rates will be just and reasonable. And we don't believe that has been demonstrated. But that can be argued at step two, can't it? Yes, it can. And assume, as we highlighted in the PATH case, which is one of the few cases, it's very difficult to raise and overcome the prudence, the prudent incurment of costs. And assume that there... And even the PATH case, the challengers in that litigation, extensive evidentiary hearings, and we're only able to demonstrate imprudence as to a limited buckets of costs with respect to some double recovery issues, some marketing and advertising costs, and some other miscellaneous costs. So even if the petitioners are able to mount a successful evidentiary hearing, it's to try to challenge the prudence of those costs incurred. There's going to be... Because of the expansion of the dollar amount, there's going to be a significant amount that we're still going to be on the hook for a higher amount than we would be if there was 50% of the scope. That's the point we've been trying to emphasize here. That's something that we can't challenge again under the prudence standard in that future cost recovery proceeding. All right. If there are no more questions, your time is up. We'll give you a couple of minutes. Thank you, Your Honors. Mr. Perkins. May it please the Court, Jason Perkins for the Commission. And just to jump right in on the standing piece that has been talked about here already. So the relationship that's created by the incentive order is described at length in the San Diego case. That is the basis of why the Commission isn't challenging standing here. There's a new legal relationship created by the incentives order. And it gets to what the difference is. These are consumers. In the San Diego case, it was a regulated utility. Can you explain why Sure. Sure. So the baseline policy is what we call our opinion number 295 policy where it's risk sharing. So even if you demonstrate prudence for all the abandoned plant costs that you incurred, you only get, if you're the utility, you only get recovery of 50% of that. You have to share the risk of abandoned plant with your customers. These orders here in this proceeding change that relationship as to this project. It would be 100% of all prudently incurred costs. And the Commission, as explained in order, the incentives rule order 679, is not going to relitigate that issue later, the nexus test. So the amount of prudently incurred cost recovery will be 100% costs if there is a later proceeding. And if there is no abandonment who's paying for the cost of construction. Right. So to that question, the general rule as to when you put the project costs into rates is when the project goes into service. So the utility has to carry the costs of developing this project until it actually gets put into service. And so if it meets its in-service target, it's 2029 in this case, then the whole cost of the project go into rates in 2029. So if ITC is spending money now, engineering studies, architectural design, et cetera, in anticipation of this project going forward, those can be recovered. Can they not? Even though under either the project going forward or the project being abandoned. So once FERC approved the order, there are legal consequences now. There's a new legal relationship now in terms of risk transfer. That's what San Diego talks about. You can talk to me about it, if you will, in dollars and cents. I understand your point about when the rate takes effect and all. But ITC has won at step one and operations project 2029. It can't wait. It's got to get engineering, et cetera, studies done now. So that's going to cost it money. Can it recover those funds? And let's, in my hypothetical, assume that any utility would incur engineering costs like this. Won't those funds be recoverable from the petitioners? They would be if they're demonstrated to be prudent, but they're not. My hypothetical is they are prudent. Yeah, they're not recoverable right now. So what I'm trying to understand in terms of the standing question and your footnote five is if ITC undertakes an engineering study right now in connection with this project going forward, and whatever happens to the project, it has incurred these costs. And in my hypothetical, they are prudent. So while we don't know specifically how much ITC is going to spend on engineering costs, in my hypothetical, the amount that they seek to recover is deemed to be prudent by the commission and the petitioners have failed, in my hypothetical, to demonstrate, to overcome the presumption with evidence. So in that scenario, my hypothetical, is there not a real impact now, even though we don't know the dollar amount, precisely because the legal relationship has changed? So in that hypothetical, I think that speaks to a different type of incentive, because there are incentives such as the construction work in progress incentives. It's discussed in the incentives rule, where if you are starting to spend money on a project, and it's capital money, you're going to put into the project, you can start recovering it in your rates. That's a different incentive. So that hypothetical is possible. My hypothetical is dealing with the incentive that's at stake here. Not under this incentive. It's not possible for them to start putting this money, that kind of money in rates right away. They have to have a later, as they say in the orders, a later Section 205 proceeding to do that under this incentive. All right. So that's my point, though. Yes. Right. At what point do the consumers, it's not until the 205 proceeding? To actually see it in rates. That's right. But the legal relationship has changed. But I need to understand this clearly. I understand. As far as the consumers are concerned, there are going to be, there is a 205 proceeding. So what goes into the, what is permissibly in that rate base? It could be, in my hypothetical situation, these engineering studies, right? Right. Right. There are, as I understand it, it's a little outside of our record here, as I understand it, there have been costs that have been incurred related to this project. So there is some number that's working its way through IGC Ben West's books that they are responsible for now. They could ask for that recovery later. But that, because they haven't gotten incentives that allow them to include that now, it will have to depend on a future to abide proceeding. But the change that these orders represent into the rate making process is that difference between risk sharing 50% up to 100% of previously incurred costs. But with respect to standing, that only happens if there is an abandonment. And we have case law that says this injury has to be immediate, concrete, et cetera. So even if there is a shift in risk, there is no change right now. And the fact that there might be different rates is highly contingent. Right. I think all of that is true. I think the, what is important to the commission in an institutional sense is that we don't re-litigate these issues later. And then we're making a decision under the incentives rule as to what the future project is. Right. Right. Right. But we think that- All I'm talking about, to be clear, is standing. All right. So I don't know how you can answer Judge Pan's question the way you did and answer my question the way you did. Well, I- Because I'm ITC. I'm excited about this project. I've got engineers working on it. You know, no one would suggest that that isn't a type of cost that's potentially prudent in a 205 proceeding. So isn't there, all I'm trying to understand is, can the consumers challenge all of this at step two? And you're responding to me, yes, in a 205 proceeding, correct? They can challenge the prudence of step two. Sorry if I didn't explain that. No, that's correct. They can challenge that these expenditures are not prudent. In step two, that's right. But- But they can't challenge the existence of this incentive that we ordered in this case. The existence of the incentive is now, and that can't be re-litigated later. That's our point about preclusion. Right, but under step two of the incentive, challenges to the prudence of the cost can be raised. That's right. And as I understand your answer, they can be raised in the 205 proceeding. Right. But the nexus test, the subsection A of the rehearing order, that is not subject to rehearing. That is not subject to re-litigation later. And the reason why is that we want certainty of that finding. That's fine. I'm just interested in standing, and it seems to me that you should not have institutional interest in supporting consumers to have standing any time there's agency action that could possibly, potentially, contingently affect their rates down the line. I think this is a very peculiar case in that regard, and it's just because of the way the commission is structured, a two-step process here. But your position would be that any consumer that wants to challenge the granting of an abandonment incentive has standing. In the first step, that's right. And I don't see how that comports with our case law about immediate harm, and I actually don't see how this comports with the commission's interests, because it implies that any consumer can challenge any action that you take that could affect their rates further down the line, and that would be a lot of your agency action. Sure. We certainly don't endorse that concept. I think it's just limited to the very specific context here. But that's their theory of standing. This will affect my rates later, so I have standing. And you're supporting them? Just within the context of these very limited orders, that's all. But if that is the way the court decides the case, that is. No, no. But following up on Judge Pan's questions, I mean, we have a lot of cases out there, P backing on the Supreme Court about the imminence of injury. And my questions have been an attempt in this two-step process to explore whether or not, just like this court has held that companies don't have to go out of business before they have standing to challenge a regulation that's affecting them. Here, it's an interesting situation. These consumers are the middlemen in the process. It's not you and me as homeowners. So their concern, as I understand it, and maybe I misunderstood it, and that's what I thought Judge Pan's questions were getting at, that they are in the process of saying, we didn't have an opportunity at step one to raise some of these issues. Or if we did, we lost. And consequently, at step two, we are no longer going to be able to pursue those issues because of the presumption of prudence that will exist at step two during the 205 process. The presumption of prudence is not imposed by these orders. That's a general policy on how we do sort of prudence reviews in any sort of section 205 context where it comes up. So that's not traceable to these particular orders. And we've been very clear that the whole prudence inquiry is open for potential step two proceeding here if it even occurs. So that's a separate parallel issue as to how the commission does prudence analysis. And not to belabor this too much, but what precisely did FERC mean in footnote five? It was not challenging standing as to, I mean, I understand the court has to decide standing, but I just want to understand what the agency thought it was conceding. What, right. What we were conceding is that we have changed the legal relationship as it comes to risk between the utility and the customers. We rendered a final order in that regard. We will give it preclusive effect in later proceedings. That's if we cited our Duquesne light order on the top of that page, that's a second step order that essentially gives full effect to the first step order. It's not subject to re-litigation later. And so we're interested in whether or not the, you know, the preclusion attaches to this round. I think under this court's precedence, it would have to be one or the other. If they have no standing, they don't get to challenge this in the later round. So I don't understand why you're giving up standing. I'm sorry, I couldn't hear Judge Pan's question. It seems to me that what the commission is saying is their interest is in not having to re-litigate this in a later round. But if there's no standing, they don't have to do that. So I don't understand why they're giving up standing in this appeal. Just that it undermines the certainty of the incentive given. And so ITC Midwest will have to re-litigate the nexus test after they've already received the incentive. And so that's why it's not as reliable of an incentive that we gave. I don't understand that. If there's no standing, what changes about the proceeding, the prudence hearing down the line? Consumers can't challenge it. That's all that's happened if there's no standing. Oh, there's nothing to change about the prudence. It's just the nexus test that we've litigated here would have to get litigated again if the customers want to renew their objection at that time. So we would have to cover the same ground of re-hearing order paragraphs 18 and 19. Can't they do that if they've standing here? They wouldn't be precluded if they weren't able to get review of it. Yeah, I'm just trying to understand why you're taking the position you're taking in this court. And I don't see how it's in the commission's interests. Can you explain that? Sure. So if you take a step back to the incentives rule itself, we identified that there are some incentives you might be able to seek through just a one-step 205 process as discussed in San Diego as well. This one in San Diego also talks about the fact that this one might be the kind that is really only available through a two-step process because the incentives orders that we issue take effect on a certain date and only costs after that date are applicable to this incentive. So the date matters. The timing matters. And so what we've tried to do in this case is give ITC Midwest that incentive as of August 8, 2023. But if that is not a final order that has had a chance to be fully litigated, then the customers would not be precluded necessarily from re-litigating those issues again later. And so we're not... I'm not understanding that. What do you mean they're not precluded? If they have standing to bring this appeal, they can't re-litigate these issues later in the 205? We don't re-litigate these issues later in a normal 205 process. So let's... I'm still not understanding your answer to my question then. Like, why is it in the Commission's interest here to not take the position that the consumers have no standing? Because I think that we're not trying to evade review of the Commission's order and the review would probably need to be had either here or in the 205 proceeding. We're saying it should be here under the structure of how we've given things so that there's certainty... But whatever happens here, can it still happen in the 205 case? No, we don't. We don't look at these issues again in the Nexus test issue. We look at the prudence issues there because the facts are fully developed. And I don't understand your answer to say you'd rather have it decided here than the 205 hearing because you say you're not going to decide it in the 205 hearing anyway. Isn't that what you just said to me? Am I not understanding? I'll try one more time. The first step of this process looks through to see whether or not there's a nexus between the investment to be made and the incentive received. If there is that nexus, we call it number two in the step of the three decisions to be made. If there is that nexus, that's an issue that needs to be litigated at the time of applying for the incentive. That's straight out of the incentives rule. But it could be that they don't have a right to appeal that at all. That happens all the time. Anybody can comment on anything that you're doing because you have a comment period. And that doesn't mean that every commenter has standing to appeal that to us. It happens all the time. It could just be that you don't get to appeal this, but you're saying that they should be allowed to appeal this? Well, the issue is once we've made that determination, it can affect the way that the utility has financing arrangements and other things, how they approach the decisions they're making. And so if that isn't a final order and it hasn't been fully litigated and customers can come in and challenge it later, then... But it would be a final order if they have no standing to appeal this. It would still be a final order. It's just that would a court then be able to review back to the previous issues that we decided? No. Who would have standing to bring that? Then it's possible under that theory, then there wouldn't be standing. And it would also be certain at that point. I think there was just an uncertainty about whether or not the preclusion would attach if Article III review is not available the first time. Our institutional interest is satisfied if that is the case. So you think that FERC orders are not final until somebody can appeal them? No, it's just that if the customer's argument later is that we never got a review of why it's just and reasonable to have the extra 50%, it's hard to say why that shouldn't be part of the second proceeding where we don't want to look at those issues. All right. Thank you. All right. Thank you. Mr. Street. May it please the court. Aaron Street for the interveners. I'd like to start with standing since we were the proponent of that argument. But I do want to be sure to answer any questions the court has about the status. The court has a sui sponte obligation to be sure. Indeed. Indeed. And we felt as officers of the court, we needed to raise that. And I also want to be sure if there are any questions on the merits for my side of the V, that we get a chance to address those. But beginning with standing, just starting with a very basic procedural point, I think Judge Pan alluded to when a non-regulated party seeks a petition for review, their standing is generally not self-evident. They need to come forward with a concrete theory of standing that's backed up by some evidence in their opening brief. They haven't done that throughout this proceeding, including this morning. But more substantively, this court has four or five cases in which this court denied standing to review a FERC order that adjudicated some legal right or obligation of a utility or a pipeline because that legal obligation would not become encompassed in a rate that would have a concrete effect on the market until some later proceeding. Now, the most recent of those cases is the Kansas Corporation Commission case. And I think it's really directly on point here and addresses many of the arguments that the petitioners have made this morning. And essentially, that case says, I'll quote from page 926, a harm that will not occur unless a series of contingencies occurs at some unknown future time is not concrete, particularized, actual, or imminent. And what we have here is not just a series of contingencies, but contingencies that depend on what the Iowa Supreme Court does, what MISO does, what potentially FERC does at some point in the future with respect to this project. What I've heard from the petitioners is a series, and as well from the commission, is a series of phrases like a new legal relationship, a preclusive effect, or a risk transfer. Those are abstract concepts. Those are not concrete today or imminent harms. And in fact, they've all been rejected by this court's case law. I think the commission said their institutional interest was not having a preclusive effect. But in Kansas Corporation Commission, the court rejected precisely that argument at page 931, saying that this now or never argument cannot establish standing. In the Sealand case, which is not cited by the parties, but it's 137 Fed Third 640, the court said, quote, mere precedential effect within the agency is not alone enough for Article III standing, no matter how foreseeable the future litigation. This litigation in the future is not even foreseeable, because we have all these contingencies that would have to materialize. First of all, the Iowa Supreme Court would have to affirm the injunction. We've challenged that injunction and said it cannot apply retrospectively to take away things that have been assigned pursuant to a federal tariff to us. Sure, it can apply prospectively to future projects that MISO might assign, but both as a matter of Iowa law and federal preemption law, it cannot be assigned, it cannot be. We understand the whole scope issue is still being litigated. I would like you to answer my hypothetical. If ITC incurs costs for studies, electrical studies, and those costs are being incurred today in anticipation of this project, when ITC files its 205 proceeding, regardless of whether the project goes forward or it is abandoned because of unforeseeable events, is it your understanding that that cost can be included in the rate base? And if so, can the petitioners challenge the prudence of it? And can that challenge extend to the no nexus circumstance? Three parts. Understood, Your Honor. So, yes, if the engineering costs were prudently incurred, they could be included in the rate base if FERC ruled for us at that second stage 205 proceeding. Second part of your question. As part of that 205 proceeding, FERC has made very clear here in paragraphs 36 through 41 of their rehearing order, which is 246 to 248 in the JA, that the customers can challenge whether those costs were prudently incurred. And in fact, they can make their same broad scale challenge that they're making in this court that they are categorically not prudently incurred because we incurred them when there was this legal risk with respect to the Iowa litigation. So they can absolutely make that argument before FERC. FERC also reserved the question and said that petitioners could challenge at the 205 proceeding whether any abandonment was as a result of a cause outside of the control of ITC. And recall, that's another argument that they've made to this court, that somehow this litigation was within our control and so we shouldn't be allowed to get the incentive. Third part of your question, Judge Rogers. The nexus, it's our position that the nexus test, which is the test for granting the incentive in the first instance, cannot be re-litigated at stage two. Those prudence and abandonment issues, which have a lot of factual overlap with the nexus test, yes, those can be re-litigated. But that just gets back to what I was saying at the outset of my remarks, that the preclusive effect of an earlier order on some later agency proceeding is not enough for standing, particularly when that agency proceeding may never happen. We've got to have the Iowa Supreme Court rule a certain way. We've got to have MISO say, oh, all right, we'll re-bid the project, even though we think federal law compels us to give this project ITC. We then have to pursue the 205 cost recovery proceeding, and then we'd have to prevail in the proceeding. And that would have to increase rates. So I think there's a lot of contingencies that are outside of the control of any of the parties here and that are analogous to those that were at issue in this court's cases. Now, I think that sort of brings us back to San Diego, which is the only case really cited by the commission and the customers that's relevant to the abandonment incentive. And I think there, Judge Pan put her finger on the question, which is the denial of the incentive to the petitioner has an immediate, to a utility, has an immediate effect on their ability to access capital. And that was proven up in that case. There's nothing like that here. The only dollars and cents cost comes if the incentive is granted and it gets incorporated into the rate base. So it's just two, it's really just apples and oranges there. Uh, I did want to make sure I addressed, I think the court understands the retrospective scope of the injunction issue. I did want to mention one development that's happened since the briefs were filed here, apart from the appeal to the Iowa Supreme Court, which will go on, who knows, months or years. And I think shows why FERC needs to act and give parties certainty when they can. But another thing that's happened is that MISO has looked at the Iowa litigation and recall that the Iowa injunction itself, which is attached to one of the briefs, says that if this project is assigned for reasons independent of the right of first refusal, that the injunction doesn't even cover that. It doesn't prevent ITC from moving forward. MISO has looked at that injunction and has looked at its own tariff, which is binding as a matter of federal law, and says we continue to assign this project to ITC. ITC has the right and the obligation to construct this project, notwithstanding the result of the Iowa right of first refusal litigation. So I think a lot of the uncertainty that's tried to cast on this is unfounded. And I think it just shows how attenuated the chain of contingencies is. When did that happen? That was in August of this year. Okay, so my question to you was the status of the project. What is the status of the project? Can it now, the part of it anyway that's subject to the abandonment incentive, can it now go forward? That is ITC's position, Your Honor. Yes, we've been moving forward, consistent with our understanding of the injunction and the MISO variance analysis. Am I correct that part of this project has been awarded without regard to the abandonment incentive? Yes. Well, I want to make sure I understand the question. Can you tell me if I'm going down the wrong track? There were four projects that were assigned to ITC in Iowa pursuant to the right of first refusal. ITC only sought the abandonment incentive as to this one because it made an analysis that the risks here were higher. Not to do with the ROFR because the ROFR applied to all four projects, but it looked at the regulatory, environmental, and permitting risks of this project and decided one out of the four were going to seek the abandonment incentive. Right, but the other three are going forward or what's the status of the other three? I believe they're similarly situated in terms of going forward. Under our understanding of the injunction and the MISO variance analysis. What you just said seems highly significant though. You're saying that there's an adequate and independent ground for ITC to have these projects aside from the ROFR, the right of first refusal, meaning all of these issues really don't affect ITC's ability to run this project. That's our position. So what I'm saying is significant and not significant at the same time. If I can explain that.  Well, it's certainly disputed as a legal matter, but also this court's reviewing the FERC order at the time it was issued, right? So it has to deal with FERC issuing this order at the time that it issued it, which was when a temporary prospective injunction was in place, but not anything that was arguably retrospective that affected this project. I guess you could all settle this. Well, if the other side agreed, we could go ahead and construct this project. Yes. And ITC, I mean, just for the record, we want to construct this project. We have no belief that we will abandon it. We want to move forward with it. We're just seeking the incentive that the Congress and the commission has put forward for things that have significant regulatory risk. I do have a question about that because this project is one piece of sort of a multi-state giant project. And if for some reason ITC were found to be not the proper person to do it, what would happen to all the work that you've done on the project so far? Would that get transferred to whoever the new, I guess, project developer would be? Yes. So if I could answer a predicate question to that, which is I think we could have a very interesting situation if the Iowa Supreme Court says this thing is retroactive and applies to this project, right? That in and of itself doesn't reassign the project away from ITC. To do that, you would have to have MISO double back on what its understanding of its own tariff is and decide to competitively bid it. And you'd have to have a competitor win that bid, which is yet another chain in the contingencies. But yes, I think to go back to your question, I think that that is correct, that we would be able to, to a certain extent, hand over the land, whatever building has been done. Now, that would be a negotiated transaction, obviously. But it wouldn't all go to waste. That another company wouldn't come along and have to redo everything. Right. So they would pay you. And so the abandonment costs would be lessened by whatever you do. Yes. Correct. Correct. All right. Thank you. Why don't you take two minutes? Thank you. Thank you, Your Honors. I have a few points I'd like to hit here. First, with respect to the update in Iowa, October 22nd, 2024, the competitive developers filed a motion to enforce the permanent injunction. So this is very much in dispute litigation. And ITC submitted a response recently on November 4th. And with respect to the MISO tariff, it's worth highlighting, MISO is not an expert in Iowa law. And its federal tariff merely references the applicability of state law. So this isn't some profound federal authority that it's relying on. It's being disputed in Iowa at this stage of the litigation where the utilities have elevated federal preemption rights. I wanted to touch on intervener counsel mentioned the Kansas Corporation Commission decision aren't standing. We don't have all these contingencies and speculation upon speculation. We're not arguing standing with respect to what happens in Iowa. It's the incentive itself. And in the San Diego case, this court mentioned that it's the abandonment may never occur, but there's a concrete dispute over the scope of the current beneficial assurance. And I know it was with respect to the utility, but we respectfully submitted conversely should apply to consumers. And with the Kansas Corporation case, it's important because there were contingencies there about a parent company submitting a bid about the grid operator. This was SPP, the Southwest Power Pool, awarding that bid. And then the subsidiary may be choosing to use formula rates. And then the Corporation Commission filing a complaint. So there were several contingencies that aren't at play here. Here, the utility loses the project, files for abandonment, cost recovery under section 205. It's also worth mentioning to distinguish the Kansas Corporation Commission case that on oral argument before this court, the Kansas Corporation Commission's attorney conceded, well, it may turn out there is no issue. We have no problem. The formula rates could be turned out to be just and reasonable. Here, that's not the case. We have a problem no matter how, whatever happens in Iowa and however the abandonment cost recovery is sought. So that remains an issue. The last point to make, if I may, and then I will close, with respect to prejudging the prudence. I just want to make sure this point is understood by the court and what we meant. So the purpose of the issuance of a transmission incentive is to encourage transmission of project development. And that is exactly what FERC did. Knowing that the utility here was tied up in litigation, it's saying proceed with doing what you can to develop the project. And so that is why consumers are going to be locked in in a very difficult situation because probably any other utility in the shoes of ITC Midwest would reasonably and deliberately attempt to litigate and fully claim those ownership rights because they've been encouraged by the regulator to proceed with project development. And if your honors have no further questions, we would respectfully ask that the final orders be reversed and vacated. Thank you.
judges: Henderson; Pan; Rogers